1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CALIFORNIA CHAMBER OF                  No. 2:24-cv-03798-DJC-
      COMMERCE, et al.,
12

13                       Plaintiff,

14          v.                               ORDER

15    ROBERT BONTA, et al.,

16                       Defendants.

17

18          This case concerns a challenge to California Senate Bill 399, which broadly

19    speaking prohibits employers from subjecting employees to adverse action where the

20    employee declines to attend a meeting where the employer communicates his or her

21    opinion about religious or political matters.  Importantly for resolving this motion is

22    the fact that political matters expressly includes discussions related to the decision

23    whether or not to form or join a labor union.  Plaintiffs, a collection of employer

24    interest groups, seek to preliminary enjoin the enforcement of SB 399 on the grounds

25    that it is preempted under the National Labor Relations Act and violates the Free

26    Speech Clause of the First Amendment.  Plaintiffs are particularly concerned that SB

27    399 will chill employer speech thereby distorting the conversation between

28

                                            1

1    employers and employees.  Plaintiffs also contend that SB 399 is a viewpoint and

2    content-based regulation that cannot withstand strict scrutiny.

3         With respect to preemption, the Court agrees that SB 399 is preempted by the

4    National Labor Relations Act to the extent it purports to prohibit employers from

5    requiring the presence of employees to communicate the employer's message on

6    unionization.  The result is somewhat counterintuitive since the National Labor

7    Relations Board interprets the Act to prohibit such meetings, but under the broad

8    preemptive scope given to the Act, that matter is for the Board – not the States – to

9    decide.  Concerning the First Amendment challenge the Court rejects that SB 399

10   simply regulates conduct, since what conduct is prohibited turned solely on the

11   subject being discussed at a required meeting.  While the Court recognizes the State's

12   interests in protecting employees in these circumstances, the Court concludes SB 399

13   is a content-based regulation of speech that cannot withstand strict scrutiny.

14   Accordingly, the Court GRANTS Plaintiffs' requested relief and preliminarily enjoins SB

15   399.

16                              **BACKGROUND**

17        In 2024, the California Legislature enacted Senate Bill 399 ("SB 399"), codified

18   as California Labor Code § 1137, which became effective January 1, 2025.  (Mot. PI

19   (ECF No. 13) at 1.)  SB 399 was enacted in response to the Legislature's concern about

20   "captive audience meetings" held by employers during which employers share their

21   opinions on political or religious matters unrelated to the employees' job duties.  (Def.

22   Opp'n (ECF No. 19) at 1–2; Liska Decl. (ECF No. 19-1) Ex. 1, at 5; Liska Decl. Ex. 4, at 4;

23   Liska Decl. Ex. 5 at 3.)  These meetings can be mandatory, and employees who do not

24   attend risk adverse employment action.  (Def. Opp'n at 1; Liska Decl. Ex. 1 at 4.)  The

25   Legislature expressed serious concern about such retaliation and the potential for

26   coercion given than employees may feel compelled to adopt their employer's

27   viewpoints on political and/or religious matters.  (Def. Opp'n at 2–3; Liska Decl. (ECF

28

1    No. 19-1) Ex. 1, at 5; Liska Decl. Ex. 4, at 4; Liska Decl. Ex. 5 at 3.)  To those ends, SB

2    399 provides that:

> [A]n employer, except as provided in subdivisions (g) and
> (h), shall not subject, or threaten to subject, an employee to
> discharge, discrimination, retaliation, or any other adverse
> action because the employee declines to attend an
> employer-sponsored meeting or affirmatively declines to
> participate in, receive, or listen to any communications with
> the employer or its agents or representatives, the purpose
> of which is to communicate the employer's opinion about
> religious or political matters.  An employee who is working
> at the time of the meeting and elects not to attend a
> meeting described in this subdivision shall continue to be
> paid while the meeting is being held.

Cal. Lab. Code § 1137(c).  "Political matters" are defined as "matters relating to

elections for political office, political parties, legislation, regulation, and the decision

to join or support any political party or political or labor organization."  *Id.*

§ 1137(b)(3).  Religious matters are "matters relating to religious affiliation and

practice and the decision to join or support any religious organization or association."

*Id.* § 1137(b)(4).

Defendants highlight several exceptions to SB 399.  First, SB 399 does not

restrict an employer from conveying information related to an employee's job duties.

*See Id.* §§ 1137(g)(1); 1137(h)(5); 1137 (g)(4); 1137 (g)(4).  Additionally, SB 399

exempts situations involving circumstances that do not implicate the Legislature's

concerns over coercion present in the mandatory meeting scenario.  *See Id.*

§§ 1137(h)(1)–(4), (h)(6).  Lastly, Defendants note that SB 399's definition of

"employee" is not limited based on union-status.  *See id.* § 1137(b)(1).

Plaintiff California Chamber of Commerce (CalChamber) is a nonprofit business

association with approximately 13,000 members in California and represents the

interests of the business community in a broad range of legislative, regulatory and

legal issues.  (Mot. PI at 6; Decl. of Ben Golombek ("Golombek Decl.") (ECF No. 13-2)

3

1  ¶ 3.)  Plaintiff California Restaurant Association is a member of CalChamber and is the
2  "uniting voice" of the restaurant industry and a non-profit organization that promotes
3  and protects industry interests through lobbying, monitoring the legislative process,
4  initiating grass roots campaigns, and establishing a membership network across
5  California.  (Mot. PI at 6; *See* Decl. of Jot Condie (ECF No. 13-4) ¶ 3; Golombek Decl.
6  ¶ 3.)  Plaintiff Western Growers Association is also a non-profit organization and
7  member of CalChamber, and has a membership of nearly 2,400 family farmers, and
8  advocates for industry interests through lobbying, monitoring the legislative process,
9  and advocacy initiatives across the Western States.  (Mot. PI at 6–7; *See* Decl. of Cory
10  Lunde (ECF No. 13-3) ¶ 3; Golombek Decl. ¶ 3.)  Together, these Plaintiffs seek to
11  preliminarily enjoin Defendants Robert Bonta, Lilia Garcia-Brower and the Division of
12  Labor Standards Enforcement of the California Department of Industrial Relations
13  from enforcing SB 399.  (Mot. PI at 1.)  Additionally, the California Federation of Labor
14  Unions, the California Coalition for Worker Power, the California Rural Legal
15  Assistance Foundation, California Employment Lawyers Association, Warehouse
16  Worker Resource Center, and Equal Rights Advocates have filed an Amici Curae Brief
17  opposing Plaintiffs' Motion.  (Am. Opp'n (ECF No. 22).)

18       Plaintiffs contend that SB 399 unlawfully regulates non-coercive speech of
19  employers through implementing a "sweeping" limitation on speaking to employees
20  about religious and political matters.  (Mot. PI at 1.)  In particular, Plaintiffs are
21  concerned about the inclusion of "the decision to join or support any . . .labor
22  organization" within the list of topics included within the definition of "political
23  matters."  (*Id.*)  Plaintiffs allege that in enacting such a statute, the Legislature has
24  placed its thumb on the scale in favor of labor.  (*Id.*at 15.)  Plaintiffs argue that relief is
25  proper because SB 399 violates the First and Fourteenth Amendments by
26  discriminating against employers' viewpoints on political and religious matters,
27  regulating the content of employers' communications with their employees, and by
28  chilling and prohibiting employer and union-related speech.  (*Id.* at 1–2.)  Additionally,

4

1    SB 399 is alleged to be preempted by the National Labor Relations Act, because it

2    "intrudes" into the NLRA's express protection of employer speech concerning

3    unionization, provided the employer does not threaten or promise employees benefit

4    in the exercise of their protected concerted activities. (*Id.* at 2.)

5        Defendants and the Amici argue that Plaintiffs are distorting the description of

6    SB 399 in defining it as a law that regulates non-coercive speech of employer.  Rather,

7    SB 399 is an anti-retaliation law that does not prohibit employers from speaking on

8    matters of religious or political issues but prevents employers from punishing

9    employees with adverse employment action who do not wish to attend such

10   meetings. (*See* Def. Opp'n at 6; Am. Opp'n at 2.)  Defendants discuss the

11   "tremendous power" that employers hold over their employees and the concern

12   about employers using such a power to compel an employee to adopt the employer's

13   view on religious or political matters out of fear of employment repercussions. (Def.

14   Opp'n at 2–3.)  Moreover, the Amici contend that California has a long-standing

15   history of protecting employees' autonomy in making their decisions about political

16   and religious matters, and SB 399 is in lockstep with its taxonomy of anti-retaliation

17   provisions that regulate the employment relationship. (Am. Opp'n at 4.)

18       Plaintiffs first filed suit against Defendants in December 2024.  A few months

19   later, Plaintiffs filed the instant Motion for Preliminary Injunction.  The Defendants filed

20   an Opposition, as did the Amici, and Plaintiffs filed a Reply (Reply (ECF No. 23)).  The

21   Court heard oral argument on May 22, 2025, and allowed the Parties to submit

22   additional briefing. (ECF Nos 28, 29.)

23                                **LEGAL STANDARD**

24       Plaintiffs seeking a preliminary injunction must establish that (1) they are likely

25   to succeed on the merits, (2) they are likely to suffer irreparable harm absent

26   preliminary relief, (3) the balance of equities tips in their favor, and (4) and injunction is

27   in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  The

28   Ninth Circuit employs a sliding scale approach to the *Winter* factors, under which a

1  strong showing on the balance of hardships may compensate for a lesser showing of

2  likelihood of success.  *See Where Do We Go Berkeley v. California Dep't of Transp.,* 32

3  F.4th 852, 859 (9th Cir. 2022).

4      For cases arising under the First Amendment, showing a likelihood of success

5  on the merits often results in finding that the remaining *Winter* factors are also

6  satisfied.  *See Am. Beverage Ass'n v. City & Cnty. of San Francisco,* 916 F.3d 749, 757–

7  78 (9th Cir. 2019).  When a plaintiff has "a colorable First Amendment claim, they have

8  demonstrated that they likely will suffer irreparable harm if the [law] takes effect."  *Id.*

9  at 758.  Further, finding a plaintiff has raised serious First Amendment questions

10  compels a finding that the balance of hardships tips sharply in their favor.  *See id.*

11  Lastly, there is a "significant public interest in upholding First Amendment principles"

12  and "it is always in the public interest to prevent the violation of a party's constitutional

13  rights."  *Id.* (internal quotation marks and citations omitted).

**DISCUSSION**

14

15  **I.    Standing**

16      The Amici argue that Plaintiffs lack standing to seek injunctive relief.  (Am.

17  Opp'n at 5.)  Particularly, they contend that Plaintiffs cannot bring a pre-enforcement

18  challenge because they have not adequately alleged a "concrete plan" to violate SB

19  399.  (Mot. PI at 5–6.)  Plaintiffs contend that they have adequately pled standing and

20  ripeness.  (*See* Reply 10–14.)

21      At the preliminary injunction stage, Plaintiffs "must make a clear showing of

22  each element of standing, relying on the allegations in their complaint and whatever

23  other evidence they submitted in support of their preliminary-injunction motion to

24  meet their burden."  *LA All. for Hum. Rts. v. County of Los Angeles,* 14 F.4th 947, 956–

25  57 (9th Cir. 2021) (cleaned up).  Further, plaintiffs must demonstrate standing for each

26  form of relief sought and the remedy must be narrowly tailored to redress their

27  particular injury.  *See id.* at 957 (cleaned up).  Plaintiffs allege a theory of associational

28  standing, which requires at least one of their members to have suffered (1) an injury in

6

1  fact, (2) caused by the defendant's challenged conduct and (3) is likely redressed by a

2  favorable judicial ruling. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992); *see*

3  *NetChoice, LLC v. Bonta,* ---- F.4th ----, 2025 WL 260007, at *6 (9th Cir. 2025)

4  (explaining that associational standing requires showing its members have standing to

5  sue on their own). An injury in fact must be "concrete, particularized, and actual or

6  imminent[.]" *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (internal

7  quotation marks omitted. When the First Amendment is at issue, there are unique

8  standing considerations such that "the inquiry tilts dramatically toward a finding of

9  standing." *Libertarian Party of L.A., Cnty. v. Bowen,* 709 F.3d 867, 870 (9th Cir. 2013)

10  (citation omitted). This is because "a chilling of the exercise of First Amendment rights

11  is, itself, a constitutionally sufficient injury." *Id.* (citation omitted).

12      To state a pre-enforcement injury, a plaintiff must allege "an intention to

13  engage in a course of conduct arguably affected with a constitutional interest, but

14  proscribed by a statute, and there exists a credible threat of prosecution thereunder."

15  *Susan B. Anthony v. Driehaus,* 573 U.S 149, 159 (2014). The Ninth Circuit typically

16  relies on a three-factor inquiry (the *Thomas* factors) to determine whether a threat of

17  enforcement is genuine enough to confer Article III injury. *See Tingley v. Ferguson,* 47

18  F.4th 1055, 1067 (9th Cir. 2022). Specifically, (1) whether the plaintiff has a concrete

19  plan to violate the law; (2) whether the enforcement authorities have communicated a

20  specific warning or threat to initiate proceedings; and (3) whether there is a history of

21  past prosecution or enforcement. *Id.* Neither the mere existence of a proscriptive

22  statute nor a generalized threat of prosecution satisfies this test. *Id.*

23      The Court finds that Plaintiffs have adequately stated an injury in fact for

24  purposes of a pre-enforcement injury. The Court agrees that the pleadings do not

25  thoroughly express an intent to violate SB 399. However, the Complaint does indicate

26  that Plaintiffs' membership seeks to engage in the types of communications that it

27  fears are proscribed under SB 399. (*See* FAC (ECF No.12) ¶¶ 10–11, 19.) That said,

28  given the government's failure to disavow enforcement of SB 399 and the allegations

1   of chilled speech that Plaintiff plausibly makes, it appears that a pre-enforcement

2   injury exists.  The final factor regarding the enforcement of history is not dispositive

3   one way or another, as the statute became effective on January 1, 2025.  *See Tingley*,

4   47 F.4th at 1069.  Thus, Plaintiffs have adequately alleged standing for purposes of

5   this Motion.

6   **II.     Likelihood of Success on the Merits**

7       **A.  NLRA Preemption**

8       The NLRA serves as the "federal architecture" that governs the relations

9   between labor and management.  *Am. Hotel and Lodging Ass'n v. City of Los Angeles*,

10  834 F.3d 958, 963 (9th Cir. 2016).  The NLRA itself contains no express preemption

11  provision.  *Id.*  That said, the Supreme Court has recognized two forms of defensive,

12  implicit preemption – known as *Garmon* preemption and *Machinists* preemption – to

13  safeguard the implementation and substance of federal labor policy.  *See id.*  Plaintiffs

14  contend that both forms of preemption apply to SB 399 such that an injunction is

15  proper.  (Mot. PI at 13.)  Defendants largely argue that SB 399 is not preempted by the

16  NLRA because SB 399 is a minimum labor standard deeply rooted in the States' power

17  to protect individual employees' autonomy.  (*See* Def. Opp'n at 17–18.)  The Court will

18  address both forms of preemption and any relevant exceptions.

19      **1.  NLRA Background**

20      Congress's enactment of the NLRA reflects its determination that protecting the

21  right of employees to organize and bargain collectively is necessary to address "[t]he

22  inequality of bargaining power between employees who do not possess full freedom

23  of association or actual liberty of contract, and employers who are organized in the

24  corporate or other forms of ownership association."  29 U.S.C. § 151.  Section 7 of the

25  NLRA protects employees' rights "to self-organization, to form, join, or assist labor

26  organizations, to bargain collectively through representatives of their own choosing,

27  and to engage in other concerted activities for the purpose of collective bargaining or

28  other mutual aid or protection."  *Glacier Northwest, Inc. v. Int'l Bhd. of Teamsters Loc.*

1   *Union No. 174,* 598 U.S. 771, 775 (2023) (citing 29 U.S.C. § 157).  Section 8 prohibits

2   employers and unions from engaging in certain "unfair labor practice[s]," including

3   employees' exercise of the rights outlined in Section 7.  *Id.* (citing 29 U.S.C. § 158).

4          To support the enforcement of the NLRA, Congress also established the

5   National Labor Relations Board.  *Id.*  The NLRB has the authority "to prevent any

6   person from engaging in any unfair labor practice" that "affect[s] commerce."  *Id.*

7   (citing 29 U.S.C. § 160(a)).  This "authority kicks in when a person files a charge with

8   the agency alleging that an unfair labor practice is afoot."  *Id.* (citing 29 C.F.R. § 101.2

9   (2021)).  Even so, not all parties seeking to resolve a labor dispute go directly to the

10  NLRB.  Instead, parties might first to the courts, thereby creating situations where state

11  law resolves a labor dispute one way, while the NLRA says something different.  *See*

12  *id.* at 776 (citations omitted).

### 2. *Garmon* Preemption

#### i.      *Garmon* Background

15         Recognizing the danger of state interference arising from conflicting court and

16  NLRB decisions, the Supreme Court has held that "[w]hen an activity is arguably

17  subject to [section] 7 or [section] 8 of the [NLRA], the States as well as the federal

18  courts must defer to the exclusive competence of the NLRB."  *S.D. Bldg. Trades*

19  *Council v. Garmon,* 359 U.S. 236, 245 (1959), This form of preemption, referred to as

20  *Garmon* preemption, may exist even where state law and the NLRA "only *arguably*

21  conflict."  *Glacier Northwest,* 598 U.S. at 776 (emphasis in original).

22         Although broader than other forms of preemption, *Garmon* preemption is not a

23  standard without "teeth."  *Id.*  There must be more than a "conclusory assertion" that

24  conduct is protected or prohibited by the NLRA.  *Id.*  (citing *Int'l Longshoremen's*

25  *Ass'n, AFL-CIO v. Davis,* 476 U.S 380, 394 (1986)).  Instead, the moving party "must

26  advance an interpretation of the [NLRA] that is not plainly contrary to its language and

27  that has not been 'authoritatively rejected' by the courts or the Board."  *Id.* (citing *Int'l*

28  *Longshoremen's Ass'n,* 476 U.S. at 395).  Upon making this showing, the party must

1   "put forth enough evidence to enable the court to find that the Board reasonably

2   could uphold a claim based on such an interpretation." *Id.*  Failure to meet either of

3   these tests will not support a finding of *Garmon* preemption.  *See id.* at 779 (finding

4   that the moving party did not meet its burden where it "passe[d] the first test but

5   fail[ed] the second").  Once the burden of showing that "there is an arguable case for

6   pre-emption" is met, the court must await the Board's resolution of the legal status of

7   the conduct.  *Id.* at 777.  For it is only if the NLRB decides that conduct is not protected

8   or prohibited [by the NLRA] that a court may entertain the litigation.  *Id.*

9          The difference between conduct protected by Section 7 or prohibited by

10  Section 8 is relevant as it relates to the animating concern behind the need for

11  *Garmon* preemption.  Where laws regulate conduct protected by Section 7, the

12  concern is that the state court will improperly restrict conduct actually protected under

13  the NLRA.  *Sears, Roebuck & Co. v. S.D. Cnty. Dist. Council of Carpenters,* 436 U.S.

14  180, 203 (1978).  As such, "pre-emption follows not as a matter of protecting [the]

15  primary jurisdiction [of the NLRB], but as a matter of substantive right."  *Brown v. Hotel*

16  *& Rest. Emps. & Bartenders Int'l Union, Loc. 54,* 468 U.S. 491, 503 (1984).  But where

17  the state law regulates prohibited conduct under Section 8, the concern is rooted in

18  ensuring the NLRB's "primary jurisdiction to enforce the statutory prohibition against

19  unfair labor practices" under the NLRA.  *See Sears,* 436 U.S. at 198.

20         *Garmon* preemption is not "inflexible" or "mechanical" such that it applies at

21  any time to state law that regulates the workplace.  *Id.* at 188.  In fact, there several

22  recognized exceptions.  First, a court is allowed to resolve a claim if the party raising

23  such claim lacks a "reasonable opportunity" to secure a Board decision on the legal

24  status of the conduct at issue.  *Glacier Northwest,* 598 U.S. at 777 n.1 (citation

25  omitted).  Next, a court may entertain litigation where that conduct is "a merely

26  peripheral concern" of the NLRA.  *Id.* (citation omitted).  The last exception exists,

27  "where the regulated conduct touche[s] interests so deeply rooted in local feeling and

28  responsibility that, in the absence of compelling congressional direction" a court

1  cannot conclude that Congress "deprived the States of the power to act." *Id.* (citation

2  omitted).

3         This Court also recognizes that in many circumstances, *Garmon* preemption is

4  invoked as shield. *See, e.g.*, *Glacier Northwest,* 598 U.S. 771 (2023); *Moreno v.*

5  *UtiliQuest, LLC,* 29 F.4th 567 (9th Cir. 2022). Here, however, Plaintiffs seek to use

6  *Garmon* as a sword to strike down SB 399. In *Idaho Building and Construction Trades*

7  *Council v. Inland Pacific*, 801 F.3d 950, 954 (9th Cir. 2015), the Ninth Circuit addressed

8  a facial challenge brought by two unions seeking to enjoin an Idaho statute banning

9  "job targeting" or "market recovery programs" because it was preempted by the

10  NLRA. The Ninth Circuit affirmed in relevant part the district court's grant of injunction

11  and grant of summary judgment because the NLRB made clear that the conduct at

12  issue was at least arguably protected by the NLRA and thus preempted under

13  *Garmon*. *Id.* at 962. As to the facial nature of the challenge, the Ninth Circuit applied

14  the standard outlined in *United States v. Salerno[1],* 481 U.S. 739 (1987), and found that

15  the "[a]ll of the conduct prohibited by the Act is either actually or arguably protected

16  under § 7, and no exception to preemption applies." *Idaho Bldg.,* 801 F.3d at 967.

17  This Court will apply a similar framework to this matter, recognizing that "we must be

18  careful not to go beyond the statute's facial requirements and speculate about

19  hypothetical or imaginary cases." *Wash. State Grange v. Wash. State Republican Party,*

20  552 U.S. 442, 450 (2008) (citation and internal quotation marks omitted).

21         With these principles in mind, the Court now addresses whether Plaintiffs have

22  met their burden of invoking *Garmon* preemption and if they have, whether

23  Defendants are correct that an exception applies. The Court will then address

24  *Machinists* preemption.

25  ////

26

---

27  [1] The Ninth Circuit applied this standard without deciding whether it was the appropriate standard. But
   in *Puente Arizona v. Arpaio,* the Ninth Circuit stated that the *Salerno* standard applies in typical facial
28  challenges. 821 F.3d 1098, 1104 (9th Cir. 2016).

1          ii.    ***Garmon* Analysis**

2          Plaintiffs argue that SB 399 is preempted by the NLRA because SB 399's

3    proscription of union-related messages when conducted during a mandatory meeting

4    directly conflicts with Section 8(c).  Plaintiffs also argue that while the conduct here

5    may be preempted by the NLRA, the responsibility for making that decision rests with

6    the NLRB, not the State, such that *Garmon* preemption still exists.  Lastly, Plaintiffs

7    argue that SB 399 nevertheless "stymies" employees' ability to learn about the

8    advantages and disadvantages of unionization, which interferes with Section 7 of the

9    NLRA.[2]  Defendants do not meaningfully contest that *Garmon* preemption exists in this

10   case but focus their arguments on the exceptions described above.  That said, the

11   Court first assesses whether Plaintiffs have met the burden of invoking *Garmon*

12   preemption before turning to the exceptions advanced by Defendants.

13          As the party invoking *Garmon,* Plaintiffs must "advance an interpretation of the

14   [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively

15   rejected' by the courts or the [NLRB] and [ ] offer enough evidence to enable the

16   Court to find that the [NLRB] reasonably could uphold a claim based on such an

17   interpretation."  *Moreno,* 29 F.4th at 577 (citations omitted).  Since *Garmon*

18   preemption looks to what the NLRA actually or arguably protects or prohibits, "we

19   look principally to the decisions of the NLRB to decide whether *Garmon* preemption

20   applies."  *Idaho Bldg.*, 801 F.3d at 962.

21          Here, Plaintiffs point to the NLRB's decision in *Amazon.com Servs. LLC,* 373

22   NLRB No. 136, 2024 WL 4774441 (Nov. 13, 2024), to argue that *Garmon* preemption

23   exists.  In the *Amazon* decision, the Board overruled its holding in *Babcock & Wilson*,

24   which had held that "captive-audience meeting[s] [were] not unlawful" based on the

25   language of Section 8(c) of the [NLRA], and its legislative history.  *Id.* at *17.  A captive-

26   audience meeting in this context is a mandatory meeting urging employees to reject

27   _____

28   [2] While Plaintiffs' position is somewhat inconsistent as to whether the conduct is ultimately permissible under the NLRA, it is consistent in that the Plaintiff believes that the issue is one for the <u>NLRB</u> to decide.

1  union representation.  *See id.* at *2.  In revisiting the *Babcock* decision, the Board

2  explained that "[n]either Section 8(c) nor the First Amendment precludes the Board

3  from finding captive-audience meetings unlawful" because nothing in Section 8(c)

4  permitted employers to compel employees to listen to their speech.  *Id.* at *19.  The

5  Board also explained that captive-audience meetings interfered with employees'

6  Section 7 rights because (1) they impinged on the Section 7 right to choose, free from

7  employer coercion, the degree to which they will participate in the debate concerning

8  representation; (2) gave employers the ability to observe and surveil employees as

9  they address the exercise of employees' Section 7 rights; and (3) were essentially

10  coercive because it compelled attendance at the risk of discharge or discipline.  *Id.* at

11  *20.  Ultimately, because captive-audience meetings "impermissibly demonstrate to

12  employees that their employer's power over them in the workplace extends to the

13  denial of the exercise of the rights guaranteed by Section 7" the Board found that

14  these meetings violate Section 8(a)(1) of the NLRA.  *Id.* at *23.

15      Plaintiffs' citation to *Amazon* is counterintuitive, because the content of the

16  decision contradicts Plaintiffs' argument that the types of mandatory meetings at issue

17  here are protected under Section 8(c), at least as it pertains to unionization.  Thus,

18  Plaintiffs' interpretation of Section 8(c) is not reasonably supported, at least as to the

19  NLRA.  However, Plaintiffs alternatively argue that "even if mandatory meetings to

20  discuss unionization in the workplace are prohibited" that *Garmon* preemption still

21  applies.  (Mot. PI at 14.)  The *Amazon* decision indicates that to the extent that

22  mandatory meetings discussing unionization are proscribed by SB 399, such meetings

23  constitute activity that is prohibited under Section 8 of the NLRA.  Thus, *Garmon*

24  preemption has been properly invoked here because there is an interpretation of the

25  NLRA that has not been rejected and evidence to show that the conduct is, in fact,

26  prohibited.  *See Glacier Northwest,* 598 U.S. at 777.

27      Defendants do not outright dispute the fact that *Garmon* applies.  Rather, they

28  point to two of the three recognized exceptions to *Garmon* in arguing that

13

1    preemption is improper.  First, Defendants argue that this case does not involve a

2    situation where a party could have raised a claim before the Board itself.  Given the

3    lack of opportunity or attempt to bring an identical claim before the Board such that it

4    could exercise its primary jurisdiction, Defendants argue, *Garmon* preemption does

5    not apply.  Second, Defendants argue that SB 399 involves "interests so deeply rooted

6    in local feeling and responsibility that, in the absence of compelling congressional

7    direction" and the court cannot conclude that Congress deprived the States of the

8    power to Act.  The Court considers each exception in turn.

9                         **a.  Reasonable Opportunity Exception**

10            Under the reasonable opportunity exception, where the party raising a

11   preemption claim lacks a reasonable opportunity to secure a NLRB decision on the

12   legal status of the conduct at issue, *Garmon* may not apply.  *Glacier Northwest,* 598

13   U.S. at 777 n.1.  This exception exists because concerns around protecting the Board's

14   primary jurisdiction are inapplicable when the aggrieved party may not bring a charge

15   to the NLRB, nor induce his opponent to do so.  *See Sears,* 436 U.S. at 201("In this

16   case, Sears could not directly obtain a Board ruling on the question whether the

17   Union's trespass was federally protected.").  Although, a "lack of recourse [does not]

18   automatically render[] the preemption doctrine invalid," the court, "must reconsider

19   any rote application of the doctrine." *John S. Griffith Const. Co. v. United Broth. of*

20   *Carpenters & Joiners of S. Cal.,* 785 F.2d 706, 710 (9th Cir. 1986) (citations and

21   quotation marks omitted).  The purpose of this exception is ultimately to protect the

22   Board's jurisdiction while also ensuring that parties are able to seek reasonable

23   recourse.  *See Sears,* 436 U.S. at 201.

24            The Supreme Court's decision in *Sears v. San Diego County,* 436 U.S. 180

25   (1978), provides helpful context for this exception.  There, the question was whether a

26   state court was barred from hearing a trespass action stemming from a labor dispute

27   that was, in turn, governed by federal law.  *Id.* at 199.  The employer, Sears, had

28   brought the trespass action against the defendant union.  *Id.* at 183.  Because Sears

1    could not invoke the Board's jurisdiction to determine whether the union's trespass

2    was federally protected, and because the opposing union did not invoke the Board's

3    jurisdiction, the Court held that the state court's jurisdiction was not preempted. *Id.* at

4    202.  As the Court explained, the primary jurisdiction rationale "unquestionably"

5    requires that where the same controversy may be presented to the state court or the

6    NLRB, it must be presented to the Board.  *Id.*  However, that rationale is not sufficient

7    where the party who could have presented the issue to the Board did not do so, and

8    the other party could not do so.

9         Here, Plaintiffs are organizations that represent employers and employers'

10    interests across California, and the Defendants are State representatives.  Defendants

11    correctly note that Plaintiffs have nowhere alleged that they had a reasonable

12    opportunity to invoke the NLRB's jurisdiction, or that either party here even could go

13    to the Board.  However, the "reasonable opportunity" exception appears to be

14    concerned with conduct that has an unknown legal status.  *See Sears,* 436 U.S. at 203,

15    n.34 (explaining that the employer did not know whether the union's picketing was

16    perhaps protected under Section 7 and the employer himself could not seek a

17    decision from the NLRB on this issue).  This case does not present those same

18    concerns.  First, it has been established that issues of employer speech are subject to

19    the NLRB's jurisdiction.  *Chamber of Com. of U.S. v. Brown,* 554 U.S. 60, 67–69 (2008)

20    (detailing the NLRA's evolution in covering debate surrounding matters of

21    unionization – including addressing the scope of employer speech on these matters).

22    Second, the *Amazon* decision confirms that the conduct here may be prohibited by

23    the NLRB such that the Board's jurisdiction should be protected in this case.  At a

24    minimum, and in contrast to *Sears*, the *Amazon* decision shows that the Board can

25    decide the specific issue being raised by Plaintiffs.  Thus, the Court does not find that

26    this exception applies.

27    ////

28    ////

### b. Deeply Local Feeling Exception

Under the "local feeling" exception, *Garmon* preemption is inapplicable when the conduct at issue touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived states of the power to act. *Glacier Northwest,* 598 U.S. at 777, n.1. This exception is rooted in principles of federalism, *see Garmon,* 359 U.S. at 243 (explaining the need for exceptions to ensure "due regard for the presuppositions of our embracing federal system"), and recognizes States' historic responsibility for maintaining domestic peace, *see id.* (stating that states have a compelling interest in maintaining domestic peace absent clearly expressed congressional direction). Thus, *Garmon* does not "sweep[] away state-court jurisdiction over conduct traditionally subject to state regulation." *Sears,* 436 U.S. at 188. This exception has typically included laws protecting private property, bodily security, and preservation of the public order. *Davis v. Benihana, Inc.,* 772 F. Supp. 3d 524, 535, (D.N.J. 2025) (citing N.Y. *Tel. Co. v. N.Y. States Dep't of Lab.,* 440 U.S. 519, 550–55 (1979) (Blackmun, J., concurring)). Notably, however, the exception does not extend to local interests in labor policy, except to the extent permitted by Section 14(b) of the NLRA. *Idaho Bldg.,* 801 F.3d at 966.

To determine whether the local feeling exception applies, a court first determines whether adjudicating the state-law claims would present a "risk of interference with the regulatory jurisdiction of the Labor Board." *Sears,* 436 at 196. Then, it must determine whether the state law regulates a significant state interest so deeply rooted in local feeling and responsibility. *Id.* at 194–95. Lastly, a court balances the two together: comparing the significant, deeply rooted state interest, with the risk of interference with the NLRB's ability to adjudicate a controversy. *Belknap, Inc. v. Hale,* 463 U.S. 491, 498–99 (1983).

Turning first to the risk of interference, courts typically look to whether the factual and legal proofs necessary to establish an unfair labor practice charge under

1   the NLRA are the same as those necessary to prove the state law cause of action. *See*

2   *Moreno,* 29 F.4th at 576 (finding that the state claim was identical to the NLRA charge

3   because the facts alleged in the complaint could also support a finding that the

4   defendant violated the NLRA).  When the facts alleged in support of finding the state

5   law cause of action could also support finding that there was a NLRA violation, the

6   claims are identical and there is a risk of interference with the NLRB's primary

7   jurisdiction.

8        Here, as demonstrated by the *Amazon* decision, there appears to be a risk of

9   interference with the NLRB's primary jurisdiction.  A cause of action under SB 399

10  would require showing that an employer took adverse action against an employee for

11  failing to receive the employer's communications pertaining to certain political and/or

12  religious topics.  Thus, there appears to be overlap with an unfair labor charge that

13  would be filed, at least as it pertains to unionization, because determining whether the

14  employer's actions were appropriate would depend on if the speech was coercive.

15  Although SB 399 has a broader scope than a charge on this issue would, there is still a

16  substantial chance that there would be overlap with federal labor law.  Thus, the Court

17  finds that sufficiently identical controversies exist.

18       The Court next determines whether deeply rooted state interests exist and

19  balance those interests against the risk of interference with the NLRB's primary

20  jurisdiction.  Defendants contend that SB 399 falls into the local feeling exception

21  because it is a minimum labor standard that does not impact collective bargaining but

22  is designed to protect all employees from potential coercion on religious and political

23  matters and protect each individual's right to individual autonomy.  Moreover,

24  Defendants point out that SB 399 includes carveouts for meetings and

25  communications relevant to an employees' work thereby avoiding interference with

26  employee-employer regulations and only protecting the deeply rooted local concern

27  of protecting workers from coercive speech on non-workplace matters in a setting

28  where there is an imbalance.

1    Within their police powers, states have the ability to protect workers in the

2    employment relationship.  *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756

3    (1985).  Here, Defendants argue that the state seeks to protect individual autonomy

4    particularly when it comes to expression related to core political and religious values

5    in a setting with a power imbalance, that is, the workplace.  However, the fact that this

6    law expressly targets communications related to the decision to join a union renders

7    the deeply held feelings exception inapplicable.  Significantly, Defendants do not

8    point to any California laws protecting other populations from captive meetings.

9    Moreover, this is not an area where states have a long tradition of regulating behavior,

10   which would give more weight to the argument that this is a deeply held local feeling,

11   and that interference with this law would implicate the purposes of federalism.  Rather,

12   the body of case law that discusses the application of the local feeling exception has

13   traditionally applied to situations involving violent tortious behavior.  *See Farmer v.*

14   *United Bhd. of Carpenters and Joiners of Am., Local 25,* 430 U.S. 290, 299 (1977)

15   ("Nothing in the federal labor statutes protects or immunizes from state action

16   violence or the threat of violence in a labor dispute, . . . and thus there is no risk that

17   state damages actions will fetter the exercise of rights protected by the NLRA."); *see*

18   *also Casala, LLC v. Kotek,* --- F. Supp. 3d ---, 2025 WL 1442792, at *8 (D. Or. May 2025)

19   (collecting cases finding the local feeling exception applied where violence occurred).

20   Thus, the Court finds that the deeply local exception does not apply here.

21   Accordingly, SB 399 is preempted under *Garmon* to the extent that it expressly

22   covers meetings relates to whether or not to join a labor organization.

23   **3. *Machinists* Preemption**

24   **i.     *Machinists* Background**

25   The Supreme Court also established a second form of preemption, known as

26   *Machinists* preemption, to ensure that areas left intentionally unregulated by the NLRA

27   remain "controlled by the free play of economic forces."  *Brown,* 554 U.S. at 65.  Under

28   *Machinists* preemption, states and municipalities are prohibited from imposing

1   restrictions on economic weapons of self-help, unless such restrictions were

2   contemplated by Congress. *Golden State Transit Corp., v. City of Los Angeles,* 475

3   U.S. 608, 614–15 (1986). This doctrine is rooted in "preserv[ing] Congress' intentional

4   balance between the uncontrolled power of management and labor to further their

5   respective interests." *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated*

6   *Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226 (1993) (internal quotation

7   marks and citation omitted).

8        While courts must often interpret which areas in particular are left unregulated,

9   Congress has clearly expressed that states are barred from "regulating non-coercive

10  labor speech by an employer," *Interpipe Contracting, Inc. v. Becerra,* 898 F.3d 879,

11  887 (9th Cir. 2018), to "permit[] the fullest freedom of expression by each party [to]

12  nurture[] a healthy and stable bargaining process," *Intertape Polymer Corp. v. NLRB,*

13  801 F.3d 224, 238 (4th Cir. 2015). The protection of noncoercive speech is outlined

14  through a few different amendments to the NLRA. First, Sections 8(a) and 8(b) provide

15  that when Congress has "sought to put limits on advocacy for or against union

16  organization, it has expressly set forth the mechanisms for doing so." *Brown,* 554 U.S.

17  at 68. Additionally, Section 7 of the NLRA was amended to "call[] attention to the right

18  of employees to refuse to join unions, which implies an underlying right to receive

19  information opposing unionization." *Id.* Lastly, the addition of Section 8(c) clearly

20  precludes regulating speech relating to unionization "so long as the communications

21  do not contain a threat of reprisal or force or promise of benefit." *NLRB v. Gissel*

22  *Packing Co,* 395 U.S. 575, 618 (1969).

23       That said, state labor laws setting minimum labor standards are not subject to

24  *Machinists* preemption. *See Metro. Life Ins. Co.,* 471 U.S. at 756. These types of laws

25  include minimum and other wage laws, child labor laws, and laws involving

26  occupational health and safety. *Id.* Although "minimum labor standards do

27  technically interfere with labor-management relations and may impact labor or

28  management unequally . . . these standards are not preempted because they do not

1   regulate the mechanics of labor dispute resolution." *Assoc. Builders & Contractors of*

2   *Cal. Coop. Comm., Inc., v. Becerra,* 231 F. Supp. 3d 810, 820 (S.D. Cal. 2017), *aff'd sub*

3   *nom. Interpipe Contracting Co.,* 898 F.3d 879.  Instead, they make up the "backdrop"

4   for negotiations.  *Metro Life Ins. Co,* 471 U.S. at 757.  Typically, minimum labor

5   standards neither encourage nor discourage the collective bargaining processes that

6   are the subject of the NLRA.  *Id.* at 755.  They also do not have any but the most

7   indirect effect on the right of self-organization established in the NLRA.  *Id.*

8        In assessing NLRA preemption cases "judicial concern has necessarily focused

9   on the nature of the activities which the States have sought to regulate, rather than on

10  the method of regulation adopted."  *Brown,* 554 U.S. at 69 (citation omitted).  Thus,

11  while a state cannot directly regulate noncoercive speech about unionization via an

12  express prohibition, a state may not indirectly regulate such conduct through

13  alternative mechanisms.  *See id.* ("California plainly could not directly regulate

14  noncoercive speech about unionization by means of an express prohibition.  It is

15  equally clear that California may not indirectly regulate such conduct by imposing

16  spending restrictions on the use of state funds.").

17                **ii.**    ***Machinists* Analysis**

18       Plaintiffs argue that *Machinists* preemption applies because SB 399 limits free

19  debate on labor issues.  Further, by limiting employers' speech, Plaintiffs contend that

20  the State Legislature has put its thumb on the scale in favor of unionization.

21  Defendants argue that SB 399 is not preempted because it is a minimum labor

22  standard and is not a regulation of noncoercive speech, but rather of employers'

23  conduct.

24       Plaintiffs rely on *Brown* to support their argument that SB 399 intrudes on an

25  area that Congress intended to leave unregulated.  There, the Supreme Court

26  analyzed whether a California law prohibiting certain employers from using state

27  subsidies "to assist, promote, or deter union organizing" was preempted under

28  *Machinists.  Brown,* 554 U.S. at 62.  The Court ultimately held that the law was

1    preempted because it infringed on Congress's mandate not to regulate non-coercive

2    labor speech." *Id.* at 68.  In reaching its conclusion, the Court explained that the law

3    exempted activities that promoted unionization.  *Id.* at 70–73.  Additionally, the law

4    established a "formidable" enforcement scheme involving presumptions against

5    employers, permitted suit by the attorney general and any private taxpayers.  *Id.* at 72.

6    Relevant here, in *Interpipe Contracting v. Becerra,* the Ninth Circuit interpreted *Brown*

7    to stand for "straightforward proposition that § 8(c) means what it says: the

8    government may not regulate[ ] non-coercive labor speech." 898 F.3d at 889.

9          Here, SB 399 provides that employers may not subject their employees to

10   adverse employment action where employees do not wish to receive

11   communications, unrelated to their work duties, on matters of the employers' religious

12   or political speech – including specifically whether or not to join labor organizations.

13   Given the statute's focus on taking adverse employment action against employees,

14   the Defendants contend that SB 399 does not implicate the concerns outlined in

15   *Brown* since SB 399 is a regulation of conduct.  However, the Court is not convinced

16   that SB 399 is limited to just employer conduct.[3]  An individual seeking to enforce SB

17   399 following an adverse employment action would have to point to an employer's

18   speech related to whether or not to join a labor organization in determining whether

19   such adverse action was appropriate.

20         Defendants also argue that employers are not restricted from sharing their

21   views and instead are only prevented from taking adverse action against those

22   employees who do not wish to listen.  Mandatory meetings infringing on employee

23   Section 7 rights are considered coercive and the Court agrees that coercive speech is

24   not protected by the NLRA.  *See Garten Trucking LC v. NLRB,* 139 F.4th 269, 279 (4th

25   Cir. 2025) (explaining that Section 8(c) makes speech designed to effectuate an

26   explicit or implicit threat or agreement for a course of action).  However, SB 399 also

27   _____

28   [3] *See also*, discussion *infra* at p. II.B.1.

21

1    creeps into the realm of regulating noncoercive speech because it does not

2    distinguish between the two.  The legislative history of SB 399 shows that the primary

3    concerns underlying SB 399 are captive audience meetings.  However, SB 399

4    expands beyond those circumstances and applies to "any communications with the

5    employer or its agents or representatives" where the purpose "is to communicate the

6    employer's opinion about religious or political matters."  Cal. Lab. Code § 1137(c).  By

7    not limiting penalties to coercive speech, SB 399 risks interfering with employers'

8    statutory and First Amendment rights to express their opinions on whether or not to

9    join a labor organization, or from otherwise engaging in noncoercive speech.  *See*

10   *Overstreet v. Shamrock Foods Co.*, 679 Fed. Appx. 61, 564–65 (9th Cir. 2017)

11   (affirming a district court's injunction because it prohibited only coercive speech and

12   recognizing that the injunction did not infringe on Section 8(c) because defendant

13   employer could express its opinions regarding union representation).  It was also

14   evident during oral argument that the line between where employer speech falls into

15   the prohibited categories such that a communication may no longer be mandatory is

16   not entirely clear.  SB 399 ultimately risks chilling one side of the debate between

17   labor and management, and thus infringes on noncoercive employer speech.

18       Defendants also argue that SB 399 is a minimum labor standard, such that

19   *Machinists* preemption does not apply.  SB 399 applies generally to all individual

20   employees – regardless of unionization status.  *See Metro Life Ins. Co.*, 471 U.S. at

21   755.  The fact that the law applies to individual workers rather than to employees who

22   are members of a union weighs in favor of finding a minimum labor standard.

23   However, it is unclear that SB 399 will have only "the most indirect effect" on

24   negotiations between labor and management.  SB 399 sets the backdrop for

25   negotiations in that it limits what actions employers may take against employees who

26   do not wish to engage in certain conversations about unionization.  However, given

27   the impact it is likely to have on debates regarding unionization, and particularly the

28

1  strain on employers noncoercive speech, the Court finds that it is not a minimum labor

2  standard.  Thus, the Court finds that *Machinists* preemption also applies.

3           *        *        *        *        *

4           The Court concludes that it is likely that both *Garmon* and *Machinists*

5  preemption applies, and that Plaintiffs have thus established a likelihood of success on

6  their arguments that SB 399 is preempted by the NLRA.

7       **B.  First Amendment**

8           Plaintiffs also bring a facial challenge to SB 399 on First Amendment grounds.

9  Plaintiffs argue that SB 399 is a content and viewpoint-based restriction on employer

10  speech.  Defendants contend that SB 399 is a classic regulation of conduct, akin to

11  antidiscrimination laws and whistleblower protection laws.  As a result, the Defendants

12  argue, the First Amendment is not implicated, and rational basis is met.

13           In a typical facial challenge, a plaintiff only succeeds where "he establish[es]

14  that no set of circumstances exists under which the [law] would be valid, or he shows

15  that the law lacks a plainly legitimate sweep."  *Moody v. NetChoice, LLC,* 603 U.S. 707,

16  723 (2024) (internal citations and quotation marks omitted).  That said, in the First

17  Amendment context, the Supreme Court has "substituted a less demanding though

18  still rigorous standard."  *Id.* (citation omitted).  A plaintiff succeeds "if the law's

19  unconstitutional applications substantially outweigh its constitutional ones."  *Id.*at 724.

20  A First Amendment facial analysis has two parts: first, the courts are to assess the state

21  laws' scope, and second, the courts must decide which of the laws applications violate

22  the First Amendment and measure them against the rest."  *Id.* at 724–25.  Here, SB 399

23  is alleged to prohibit employers' speech in the same way, such that a facial challenge

24  is appropriate.  *See X Corp. v. Bonta,* 116 F.4th 888, 899 (9th Cir. 2024)*,* 116 F.4th at

25  899 (explaining that a facial challenge was permissible where the challenged Content

26  Category Report raised the same First Amendment issues in every application to a

27  covered social media company).

28  ////

1    **1. Expressive Conduct**

2    "The First Amendment, applicable to the States through the Fourteenth

3    Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"

4    *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1).

5    Under the Free Speech Clause, "[i]t is axiomatic that the government may not regulate

6    speech based on its substantive content or the message it conveys." *Rosenberger v.*

7    *Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 828 (1995) (citation omitted).

8    Although the government is limited in its regulation of speech, it has broad authority

9    to regulate conduct.  However, regulation of conduct may not be done as a

10   "smokescreen" for regulating speech.  *Honeyfund.com Inc. v. Governor,* 94 F.4th 1272,

11   1278 (11th Cir. 2024) (citing *R.A.V. v. City of St. Paul,* 505 U.S. 377, 385 (1992)).  In

12   determining whether the First Amendment applies, courts ask the "threshold question

13   [of] whether conduct with a significant expressive element drew the legal remedy or

14   the ordinance has the inevitable effect of singling out those engaged in expressive

15   activity." *HomeAway.com v. City of Santa Monica,* 918 F.3d 676, 685 (9th Cir. 2019)

16   (internal quotations and citations omitted).  The court may consider the "inevitable

17   effect of a statute on its face," as well as a statute's "stated purpose." *Id.* (citation

18   omitted).   But a court typically "may not conduct an inquiry into legislative purpose or

19   motive beyond what is stated within the statute itself." *Id.* (citation omitted).

20   Beginning with the statute's text, SB 399 provides, in part, that employers

21

22   [S]hall not subject, or threaten to subject, an employee to
     discharge, discrimination, retaliation, or any other adverse
23   action because the employee declines to attend an
     employer-sponsored meeting or affirmatively declines to
24   participate in, receive, or listen to any communications with
     the employer or its agents or representatives, the purpose
25   of which is to communicate the employer's opinion about
     religious or political matters. . . .
26

27

28

1   Cal. Lab. Code. § 1137(c).  The stated purpose of the statute is to protect employees

2   who were forced to attend "captive-audience" meetings and subjected to adverse

3   employment action where they declined participation.  Here, SB 399 does not facially

4   prohibit employers from expressing their religious or political views.  Rather, it

5   prohibits certain measures, specifically, taking adverse employment action against an

6   employee who does not wish to hear the employer's communications.  However, SB

7   399's prohibition applies where an employee "(1) declined to attend a meeting or

8   receive or listen to a communication, (2) the purpose of which was to communicate

9   the employer's opinion, (3) about religious or political matters."  (Def. Opp'n at 13.)

10  Thus, while the Court agrees with Defendants' contention that taking an adverse

11  employment action is not expressive conduct, SB 399 has the inevitable effect of

12  being directed toward employers who chose to engage in core expressive activity –

13  sharing their opinions on religious and political matters.

14          Consider the circumstances that arise where an employee sues her employer

15  for violating SB 399.  A decision maker would necessarily have to consider the content

16  of the employer's speech to determine whether taking the adverse employment

17  action was appropriate.  Because the "conduct regulated depends on – and cannot be

18  separated from – the ideas communicated" SB 399 regulates speech such that the

19  First Amendment is implicated.  *See Honeyfund.com,* 94 F.4th at 1278 (rejecting a

20  conduct-not-speech claim where the only way to discern which mandatory trainings

21  were prohibited was to find out whether the speaker expressed a particular

22  viewpoint).  Further, in *R.A.V. v. City of St. Paul*, the Supreme Court explained that "the

23  power to proscribe particular speech on the basis of a noncontent element (e.g.,

24  noise) does not entail the power to proscribe the same speech on the basis of a

25  content element[.]"  505 U.S. at 386.  The government may not regulate speech

26  "based on hostility–or favoritism–to the toward the underlying message expressed."

27  *Id.*  Here, SB 399 would prohibit an employer from taking an adverse action against an

28  employee who refused to receive mandatory employer communications based solely

1   on the type of speech in which an employer engaged. And more than that, the inquiry

2   would focus on whether the speech was related to certain political or religious

3   matters.

4        In opposing this conclusion, Defendants cite to Title VII, and other anti-

5   discrimination laws, which prohibit employers from taking adverse employment action

6   against employees in certain scenarios. Specifically, Title VII makes it unlawful for an

7   employer to "to fail or refuse to hire or to discharge any individual, or otherwise to

8   discriminate against any individual with respect to his compensation, terms,

9   conditions, or privileges of employment, because of such individual's race, color,

10   religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII no doubt holds a

11   significant place in our legal landscape. But while Title VII is typically understood to

12   target discriminatory conduct, it is not immune from the demands of the First

13   Amendment where expressive conduct is targeted. *See Rodriguez v. Maricopa Cnty.*

14   *Cmty. Coll.*, 605 F.3d 703, 710 (9th Cir. 2010) ("Harassment law generally targets

15   conduct, and it sweeps in speech as harassment only when consistent with the First

16   Amendment."). Moreover, some of the reach of Title VII is justified with respect

17   establishing an illegal motive and evidence of differential treatment, (Rodney A.

18   Smolla, *Smolla and Nimmer on Freedom of Speech*, § 13:5 (2025)), or as the

19   mechanism by which prohibited discrimination can be carried out, *Rumsfeld v. Forum*

20   *for Acad. and Inst. Rts., Inc.,* 547 U.S. 47, 62 (2006) or as an attempt to engage in

21   conduct that is illegal in creating a quid pro quo (*Smolla,* § 13:7), all of which are far

22   afield from SB 399. In other cases where anti-discrimination laws involve core

23   expressive conduct, moreover, courts often justify those results with reference to the

24   compelling state interest in preventing discrimination on the basis of protected

25   characteristics like race and gender. *See, e.g., Bd. of Dirs. of Rotary Intern. v. Rotary*

26   *Club of Duarte*, 481 U.S. 537, 549 (1987) (noting that even if California's Unruh Act

27   "does work some slight infringement on [the] right of expression association, that

28   infringement is justified because it serves the State's compelling interest in eliminating

1  discrimination against women); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 590

2  (2023).  Whether SB 399 likewise serves a compelling interest will be addressed later

3  in this Order.  The point for now is that the notion that SB 399 regulates conduct just

4  like Title VII and thus is exempt from First Amendment scrutiny is an overstatement of

5  the law, and an incorrect analogy.  Accordingly, the Court rejects the argument that

6  SB 399 regulates conduct alone and addresses the nature of the speech regulation.

7  **2.  Determining the Appropriate Level of Scrutiny**

8  Having concluded that SB 399 regulates speech, the Court turns to the

9  appropriate level of scrutiny.  Plaintiffs contend that SB 399 constitutes improper

10  viewpoint discrimination because the law targets employers and prohibits them from

11  sharing their viewpoints on political matters of public concern.  At oral argument,

12  Plaintiffs elaborated on this issue, explaining that because employers as a whole were

13  targeted by the law, SB 399 discriminates against the broader "employer viewpoint."

14  Embedded in the legislative history, Plaintiffs argued, is an assumption that there will

15  be conflict between the employer and employee perspective.  Because this tension

16  exists, and because SB 399 applies to employers, SB 399 is viewpoint discriminatory.

17  The Court disagrees.

18  Viewpoint-based restrictions exist where the government targets not just

19  subject matter, but also "particular views taken by speakers" on that subject matter.

20  *Rosenberger,* 515 U.S. at 829.  "A regulation engages in viewpoint discrimination

21  when it regulates speech based on the specific motivating ideology or perspective of

22  the speaker."  *First Resort, Inc. v. Herrera,* 860 F.3d 1263, 1277 (9th Cir. 2017) (internal

23  quotations and citations omitted).  Where the challenged provisions does not

24  "target[] . . . particular views taken by speakers on a subject", there is no viewpoint

25  discrimination.  *See Boardman v. Inslee,* 978 F.3d 1092, 1110 (9th Cir. 2020).

26  SB 399's prohibition applies to all employers, regardless of the viewpoints they

27  express on political or religious matters.  *See Honeyfund.com*, 94 F.4th at 1247

28  (explaining that the law at issue only allowed mandatory meetings where the speaker

1    expressed viewpoints the state agreed with).  Here, employers are no more subject to

2    SB 399 if they express pro-labor views than they would be if they expressed anti-labor

3    views.  At least on its face, the Court rejects Plaintiff's argument that SB 399

4    discriminates on the basis of viewpoint.

5         Next, Plaintiffs argue that SB 399 is a content-based regulation because what an

6    employer says during a meeting impacts whether SB 399 applies.  A law is considered

7    content-based where the government targets speech based on its topic, idea, or

8    message.  *Boyer v. City of Simi Valley,* 978 F.3d 618, 621 (9th Cir. 2020) (citation

9    omitted).  Content-based regulations are presumptively invalid under the First

10   Amendment unless they are shown to be "narrowly tailored to serve compelling state

11   interests."  *Boyer,* 978 F.3d at 621 (citation omitted).  A law is considered content-

12   based on its face if it "applies to particular speech because of the topic discussed or

13   the idea or message expressed."  *Reed,* 576 U.S. at 163.  A law that is facially content

14   neutral will still be subjected to heightened scrutiny if it cannot "be justified without

15   reference to the content of the regulated speech."  *Id.* at 156 (internal quotations and

16   citations omitted).

17        Here, SB 399 involves political and religious speech.  Political speech, in

18   particular, is at the core of the First Amendment.  "Whatever differences may exist

19   about interpretations of the First Amendment, there is practically universal agreement

20   that a major purpose of that Amendment was to protect the free discussion of

21   governmental affairs."  *Mills v. Alabama,* 384 U.S. 214, 218 (1966).  Religious speech

22   has also been recognized as a matter of public concern protected under the First

23   Amendment.  *See, e.g., Tucker v. State of Cal. Dept. of Educ.* 97 F.3d 1204, 1210 (9th

24   Cir. 1996) (rejecting the argument that an employee's religious speech is not

25   protected workplace speech because it not a matter of public concern).

26        The Court finds that SB 399 is a subject-matter based restriction on speech.

27   Defendants are correct that SB 399 encapsulates two discrete acts: hosting a meeting

28   or other form of mandatory communication and sanctioning employees for not

1   attending or receiving the communication.  But as explained above, enforcing SB 399

2   would require referencing the content of the employer's speech in determining

3   whether the adverse employment action was proper.  For example, if an employer

4   required employees to attend a mandatory meeting to discuss charitable giving, the

5   employer could fire an employee for not attending, but could not take such action if

6   the meeting were about a measure to increase the minimum wage.  That is to say, the

7   subject matter of the speech dictates whether the law applies.  The fact that SB 399

8   subjects categories of speech to different limitations compels the conclusion that it is

9   a content-based regulation.  *See Reed,* 576 U.S. at 164 (explaining that the sign code

10   at issue was content based on its face in part because the restrictions depend entirely

11   on the communicative content of the sign).

12       Defendants alternatively contend that the First Amendment does not

13   encompass a right to force a listener to hear one's speech.  To support their

14   argument, Defendants cite to several lines from cases that outline the "captive

15   audience doctrine."  Specifically, Defendant argue that California may protect

16   vulnerable employees who would be forced by their employers, under the threat of

17   losing their jobs or suffering adverse employment action, from listening to their

18   employer's religious or political opinions.

19       The captive audience doctrine has historically been applied by the Supreme

20   Court "only sparingly to protect unwilling listeners from protected speech."  *Synder v.*

21   *Phelps,* 562 U.S. 443, 459 (2011).  This narrow application stems from the principle

22   that "the Constitution does not permit government to decide which types of otherwise

23   protected speech are sufficiently offensive to require protection for the unwilling

24   listener or viewer[,]" because "the burden normally falls upon the viewer to avoid

25   further bombardment of [his] sensibilities simply by averting [his] eyes."  *Erznoznik v.*

26   *City of Jacksonville,* 422 U.S. 205, 210–11 (1975) (internal quotation marks and

27   citations omitted).  Typically, there must be a "showing that substantial privacy

28

1    interests are being invaded in an essentially intolerable manner" for the captive

2    audience doctrine to apply. *Cohen v. California,* 403 U.S. 15, 21 (1971).

3         That said, this is not an impossible standard to meet. The Supreme Court has

4    found such an invasion of substantial privacy interests in several instances. One

5    example is in the quiet enjoyment of one's home. *See Rowan v. United States Post*

6    *Office Dep't,* 397 U.S. 728, 738 (1970) (recognizing a heightened privacy interest

7    within an individual's home that may justify certain content-based restrictions on

8    speech); *Frisby v. Schultz,* 487 U.S. 474, 487 (1988) (reaffirming that residential privacy

9    is entitled to special consideration under the First Amendment and recognizing that

10   "[t]he First Amendment permits the government to prohibit offensive speech as

11   intrusive when the captive audience cannot avoid the objectionable speech."").

12   Additionally, a substantial privacy interest exists in "the psychological [and] physical

13   well-being of the [hospital] patient held 'captive' by medical circumstance." *Berger v.*

14   *City of Seattle,* 569 F.3d 1029, 1054 (9th Cir. 2009) (quoting *Madsen v. Women's*

15   *Health Ctr.,* 512 U.S 753, 768–71 (1994) and citing *Hill v. Colorado,* 530 U.S. 703, 728-

16   30 (2000)).

17        The captive audience doctrine has also been applied to other instances outside

18   of the home, , *see Lehman v. City of Shaker Heights,* 418 U.S. 298, 303–304 (1974)

19   (plurality opinion) (explaining that public transit riders are a "captive audience" unable

20   to easily avoid advertisements when commuting), but these applications have been

21   limited given that individuals in public places can avoid unwanted speech, *see*

22   *Erznoznik,* 422 U.S. at 211; *Cohen,* 403 U.S. at 22 (discussing how those who find

23   speech offensive can "avert their eyes"); *Berger,* 569 F.3d at 1029 (rejecting the

24   application of the captive audience doctrine in a public park and noting that

25   individuals offended by speech can avert their eyes or walk away). While the Court

26   appreciates the practical difficulties of leaving a mandatory meeting organized by

27   one's employer, it is simply not the case that employees are "captive" in the same

28   sense as one who is riding a bus.

1    In analyzing a law that bears some resemblance to SB 399, the Eleventh Circuit

2    in *Honeyfund.com* declined to find that employees were a captive audience where

3    they were subjected to speech they did not want to hear. 94 F.4th at 1283 n.5. In that

4    case, the court analyzed a challenge to a provision of Florida's Individual Freedom Act

5    that banned mandatory workplace trainings endorsing certain viewpoints. *Id.* at

6    1275–76. The State's arguments were mostly based on a conduct-not-speech theory,

7    arguing that the law restricted only the meeting that was held rather than the speech

8    itself. *Id.* at 1277. The court rejected this argument, explaining that "[t]he only way to

9    discern which mandatory trainings are prohibited is to find out whether the speaker

10    disagrees with Florida." *Id.* As here, the state also attempted to justify the law on a

11    captive audience basis. *Id.* at 1283 n.5. Dismissing the argument in a footnote, the

12    court explained that outside the context of the home or where the degree of captivity

13    makes it impractical for the unwilling listener to avoid exposure, "enduring speech we

14    dislike is a necessary price." *Id.*

15    The Court recognizes the imbalance between employers and employees and

16    does not minimize the challenges that employees face in these circumstances.

17    However, "we are often captives outside the sanctuary of the home and subject to

18    objectionable speech." *Cohen,* 403 U.S. at 21 (citation omitted). The Supreme Court

19    has repeatedly explained that the captive audience doctrine is to be applied narrowly

20    given the serious consequences that come from limiting speech because an individual

21    does not wish to hear it. *See Snyder,* 562 U.S. at 459. Nor have Defendants pointed

22    to any authority suggesting that employees have a right to privacy in the workplace

23    that is akin, for example, to the right of privacy an abortion patient has in one's home

24    or in attending a doctor's appointment. Given that the invasion of some privacy

25    interest has served as the basis for expanding the captive audience doctrine,

26    Defendants failure to articulate one here is detrimental to its claim. Moreover, given

27    size of the American workforce, applying the captive audience line of cases to the

28    employment context would greatly expand its application. *Cf. 303 Creative LLC*, 600

31

1    U.S. at 592 (observing the expansion of non-discrimination laws and noting that such

2    statutes can "sweep too broadly when deployed to compel speech.")  Defendants

3    have not adequately shown that this expansion is warranted.  Further, while

4    Defendants argue that there is a strong state interest in protecting individual

5    employees' autonomy, there are no other California state laws that they point to which

6    protect any group of vulnerable individuals through a captive audience rationale.

7    Given that no Court has expanded the captive audience line of cases to the

8    employment context, the Court does not find that the captive audience doctrine

9    applies to SB 399.  Accordingly, the Court will apply strict scrutiny to SB 399.

10              **3.  Strict Scrutiny**

11        To survive strict scrutiny, a state must show that the statute "furthers a

12   compelling governmental interest and is narrowly tailored to that interest."  *Reed,* 576

13   U.S. at 171 (citation omitted).  "If a less restrictive alternative would serve the

14   [g]overnment's purpose, the legislature must use that alternative."  *United States v.*

15   *Playboy Ent. Grp., Inc.,* 529 U.S. 803, 813 (2000).  In the briefing, Defendants do not

16   explicitly address the issue of strict scrutiny and maintain the argument that SB 399 is a

17   regulation of conduct, not speech.  However, the Amicus Brief and Defendant's

18   counsel during oral argument discussed the captive audience argument in the context

19   of serving as a compelling interest.

20        For similar reasons stated above, the Court does not find the desire to protect

21   captive audiences in the employment context to constitute a compelling interest.  And

22   to the extent that the parties compare this law to civil rights legislation, the interest in

23   protecting a captive audience is unlike the recognized compelling interest in

24   protecting groups that have historically been subjected to discrimination.  *See Roberts*

25   *v. United States Jaycees,* 468 U.S. 609, 623 (recognizing that the public

26   accommodations law's interest in eradicating discrimination against its female citizens

27   justified the law's application on the male organization's associational rights).  And the

28   Defendants offer no other compelling justification for the enactment of SB 399.

1    And even if a compelling interest had been established, the Court does not find

2    that SB 399 is narrowly tailored to serve that compelling interest.  In the context of the

3    First Amendment, ""[b]road prophylactic rules" are generally disfavored.  *Riley v. Nat'l*

4    *Fed. of the Blind of N.C., Inc.,* 487 U.S. 781, 801 (1988).  Even in instances where the

5    captive audience doctrine has been found applicable, the Supreme Court

6    emphasized that the remedy in question must be narrowly tailored.  In *Madsen v.*

7    *Women's Health Center, Inc.,* the Court held that a limitation on preventing petitioners

8    from approaching any person seeking services of the clinic unless such person

9    indicates a desire to communicate in an area within 300 feet of the clinic unnecessarily

10    burdened more speech than necessary to prevent intimidation and ensure access to

11    the clinic.  512 U.S. at 774.  The Court reasoned that justifying a prohibition of "all

12    uninvited approaches" was difficult and unless the petitioners' speech was

13    independently proscribable or infused with violence so as to be indistinguishable

14    from a physical harm, it could not stand.  *Id.*

15    Here, Defendants argue that SB 399 would only reach discussions forced onto

16    unwilling employees.  That said, the Court is not convinced that the scope of SB 399 is

17    as limited as Defendants claim.  To the extent that the legislature is concerned about

18    captive audience meetings, SB 399 expands beyond that situation – covering

19    meetings along with "any communications with the employer or its agents or

20    representatives . . . ."  Cal. Lab. Code § 1137(c).  Thus, SB 399 applies to

21    communications that do not involve meetings at all.  This expansive reach creates a

22    stronger likelihood of chilling speech, as employers who seek to avoid litigation may

23    also refrain from using methods other than meetings to share their views.  Moreover, it

24    is not apparent that the Legislature's concerns surrounding the captivity or coercion

25    are present in the meeting context exists in the context of receiving a newsletter or

26    walking by a flyer in the workplace hallway.  Accordingly, the Court finds that SB 399 is

27    not narrowly tailored.

28

1    For the reasons discussed above, the Court finds that the Plaintiffs have shown

2    a likelihood of success on the merits on their First Amendment argument.

3    ### III.    Remaining *Winter* Factors

4    Lastly, the Court considers the remaining *Winter* factors: irreparable harm, the

5    balance of equities and the public interest.  Defendants concede that if Plaintiffs were

6    able to show that SB 399 likely violated their constitutional rights, that would

7    constitute irreparable harm.  Since the Court has found that there is a likelihood of

8    success on the merits, this factor is satisfied.  Additionally, where the government is

9    the opposing party, the last two factors of the preliminary injunction analysis merge.

10    *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014).  Defendants

11    again concede that where a constitutional violation is met, particularly in light of the

12    First Amendment claim, these factors would be satisfied.

13    **CONCLUSION**

14    For the reasons discussed above the Court GRANTS Plaintiffs Motion for

15    Preliminary Injunction (ECF No. 13).  Defendants Bonta, Garcia-Brower, the Division of

16    Labor Standard Enforcement, and their officers, agents, servants, employees, and

17    attorneys – and others in active concert or participation with any of them – who

18    receive actual notice of this injunction by personal service or otherwise, are

19    ENJOINED from enforcing California Labor Code section 1137 pending further order

20    of this Court.

21

22    IT IS SO ORDERED.

23    Dated:   **September 30, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

26    DJC6 – CalChamber24cv03798.pi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28